Hear ye, hear ye, hear ye. The United States Code of Appeals for the Fifth Circuit is now open according to law. God save the United States and this honorable court. Good morning. Before we proceed with our first case, I want to say we have some very, very sad news this morning. Judge Tom Reveley of our court passed away. He was 99 years, closing in on 100 years old. Judge Reveley was truly a great, great, great man. He was a well-respected, renowned jurist on our court, the Fifth Circuit. Prior to that, he served on the Supreme Court of Texas. He also served as a trial court judge. He was the Secretary of State of the state of Texas. He served admirably in World War II in the Navy. He truly was a remarkable, great man, and we are greatly, greatly saddened at this tremendous loss to the court. Our hearts and our thoughts and our prayers go out to his family. We will all remember Tom as a giant among giants. He was truly a remarkable man. So, I hope that you all will remember Judge Reveley and keep his family in your thoughts. Our first case is United States v. Mata. Mr. Howes. Thank you, Chief Judge Owen. May it please the court. I'd like to start, I guess, by to Judge King over Judge Reveley's passing. That's very terrible. He was a great judge. Thank you. But on to this case. In order to convict Reynald Mata, Your Honors, the jury at his trial had to find that he knew, actually knew, that the nine individuals hidden in the trailer that he drove up to the Sarita checkpoint in July of last year were there in that trailer. Now, our principle submission in this case is that the evidence was insufficient for a jury to conclude without also reasonably doubting that Mr. Mata did know about the contents of that trailer. We've also pointed to two trial errors, one involving improper speculation under Rule 602 and a deliberate ignorance instruction. And so, what I'm going to do first is touch on the either of those two trial errors should motivate the court to, at a minimum, remand for a new trial. Before you get into this... Oh, go ahead. Oh, go ahead. Can I ask you, I mean, when I was going back over this case yesterday, how do we, I mean, can we infer knowledge, and this is you but also the government, can we infer knowledge that this was aliens versus drugs? I mean, in that part of the world, it's one or the other. And does it matter? Okay, tell me if that, my question is, that's sort of a sort of a root question. How do we know what it, how do we know, how can we infer that they knew it was aliens versus drugs versus who knows what? Well, Judge King, I think that you make a good point here. This was a trailer... I wasn't trying to make a point. I was just trying to ask a question. You raise a good point. You don't make a good point. Well taken. So, this was a trailer that could have fit people, but it was a trailer that could have also fit drugs, and it could have also fit weapons. And, you know, the root of our case is that the evidence that the government offered here in order to support the inference of knowledge was weak. It contradicted itself, and most importantly, it required the jurors to stack multiple speculative inferences on top of one another. Now, I think what, you know, to be fair to the government, what the government's argument would be is if you take our evidence in the light most favorable to us, and you don't agree that there's any reason to still reasonably doubt it, that, I mean, their whole case was that Mr. Mata was there at the time that these individuals were loaded into the trailer. So, if the government wins here, it would be because a juror could reasonably infer that he was present when they were loaded into the trailer, and therefore he knew that there were people inside. I do think that the issue that you point out would kill any chance that they could rely on deliberate ignorance instruction here, because if he didn't, if the idea is that he didn't see these individuals going into the trailer and then kind of consciously avoided asking what was in the trailer, then I don't think there would be any way to say that there's people inside as opposed to drugs or guns. But, you know, the sufficiency here, the thing that I wanted to point out, you know, Mr. Sokolow's briefs go through very thoroughly why the evidence here is problematic, but I think that the best I can do to add to that is that the root problem is that the government's case here hinged, like we've just said, on the idea that Mr. Mata was there at the time, and that theory hinged on this inference that it wanted the jury to draw from the idea that one of the non-citizens inside the trailer heard a phone call with an earshot outside of the to take a risk, according to this Mr. Alba Diaz. Council, before you go further on that, I'm a little confused on the 602 issue, which I think is what you're referring to now, and I hate to interrupt. You're talking about sufficiency, which is a separate argument, but it's intertwined with this 602 issue. I'm a little confused of who is there before they put these people in the he's overhearing one side of a phone call. I guess if you could walk us through that very briefly. These individuals who are going to be transported are present with whom, and then they get in the trailer, and who's left outside? Can you straighten that out? Yes, Judge Engelhardt, I can try to straighten it out for you, but one of the problems is that the evidence in this case doesn't really straighten that out, and you've recognized in cases before that one of the problems that the and doesn't get the right answers into the case, and I think that's one of the problems here, but so best I can tell what the government would say is that the nine individuals were at this stash house. They got up around four or five in the morning, were loaded onto this trailer, and there's a person who loaded them, and he's also, I think from the testimony, the person who is giving food to them, at least to Mr. Alvadez, testified to that effect. There's no basis in the record to conclude that there's not other people aside from these individuals that were loaded into the trailer outside of the trailer or just at the stash house that morning, and so what I think the idea that the government's theory presented was a phone call happened. The person who was there, this individual, Mr. Alvadez, heard the person pick up the phone, and then he overheard the conversation, and I guess for some reason, even though they were still right next to each other, they continued talking on the phone. I do think that's confusing me is that he's hearing both sides, and there's a phone call, and I don't know whether he's on speakerphone in someone's some other place or whether the defendant shows up after the people are put on the trailer, you see there's a bit of a disconnect there in terms of the testimony, which I assume was covered at trial and certainly subject to cross-examination. It certainly was, and I mean, a good defense lawyer would tell you that that sounds like a good reason to doubt, because I think that it's not clear on this record whether or not he might, this could have been happening on speakerphone, and you know, there's multiple problems with Mr. Alvadez's testimony, and you're right that the speculation is intertwined with the sufficiency, but the critical problem that I wanted to get to here that I think also runs throughout all three of these issues is that he didn't recognize Mr. Mata's voice, and that's so critical because he didn't recognize the voice even though both of them were put in the exact same detention cell less than three days later, and they had a face-to-face, right? He says it's the driver whose identity he doesn't know at the time, isn't the argument you're making that there's a supposition that the person talking on the phone about, yes, I will take the risk, that person is the driver, that's the testimony, right? It's not that it's Mata, it's the driver who turns out to be, that's the speculation. Yes, Judge Ingleheart, that's the speculation, that's the thing that was not within this witness's personal knowledge that he was just assuming, and we would, we have, you know, there's serious reason to think based on his other testimony that he was reverse engineering that from the fact that Mr. Mata was the only person, there was only one person at the checkpoint when they were arrested, but the point that I'm trying to make for sufficiency that's so important here is that they were put in the exact same cell, and he didn't recognize the voice of Mr. Mata as the voice that he heard outside that trailer less than three days earlier. So what that means is even if he's speculating about, I think that this was the driver, he can't reasonably think that anymore after he's gone and met the person that he knows to have actually been the driver, and then not been able to recognize that voice as the same voice. And so whatever else you think about Mr. Alba Diaz's testimony, the fact that he doesn't recognize the voice that he hears three days later as the voice he heard outside that trailer provides a, any rational person a reasonable basis to doubt that Mr. Mata is the individual on the phone call, because again what the jury had to find was it was Mr. Mata there. Otherwise there's no basis to put him outside that trailer, and there's no basis to say that he, to infer that he knew that these individuals were in that trailer. So I think that's the critical difference. I have a question actually that I didn't understand. Was the trailer hooked up to a truck at the time the Mr. Mata drove into the border checkpoint? When did it, when was it hooked to the trailer? Was it replaced by another truck? I really didn't understand. The brief seemed to be conflicting on that factual point. Well the actual answer Chief Judge Owen is we don't know, and that's important. That brings me to one of the other things that I wanted to acknowledge about the sufficiency in this case, is aside from the point that we've just discussed, which I think is crucial, it's also the case that Mr. Alva Diaz was one of two people who testified for the government in this case, two material witnesses, and they conflicted with each other on every relevant aspect vis-a-vis this phone call. The only two things that they overlapped on were we got up between four and five in the morning, were loaded onto this trailer, and then once the trailer door is shut and the truck started driving, there were very few stops in between once we hit the highway straight to the checkpoint. Perez Simon, who is this other individual, testifies that when we all got into the trailer, it was already hooked up to the truck. Alva Diaz testifies that didn't happen until this phone call that only I heard. Perez Simon also says there were 10 minutes that passed after we got loaded into the trailer. Alva Diaz says as soon as this phone call that only I heard happened, the truck drove away. And so those aren't just minor inconsistencies, Chief Judge Owen. Those are flat contradictions. And so it would have to be that in order for the jury to believe Alva Diaz's testimony, they would have to reject the testimony of the government's other witness who happened to be in the exact same vantage point at the exact same time. And so that, face-to-face in a cramped prison cell really should convince this court that the evidence just was not here. And I'd like to take a minute, I guess we've talked about the speculation and we can talk further about that if the court has questions, but the valuable cargo inference is what I call this, that the government relied on, you know, that the people who were in this trailer paid a lot of money. And so the CEOs of any alien smuggling organization wouldn't trust somebody who doesn't know to take care of this precious cargo. To whatever extent the court thinks that that might have relevance in a drug case, it just doesn't map onto a human smuggling case. Because in the drugs, you don't pay for them until they arrive at their destination. It's that kind of transaction. With non-citizens, they always pay up front, just like they did in this case. And that's just always the case. Every BSR I've ever read, and I've read a lot on this, I mean, every once in a while, they pay 75% up front, but the fact is they pay. And so there's, it's just not the case that if a person gets caught, the people who need to get paid aren't going to get paid. They have already been paid. So that inference wasn't even in this case, but as this case, we cited in our brief and the VARA case, which Chief Judge Owen, you joined along with Judge Dennis. The courts recognized very clearly that that inference, even to the extent it applies, can't add anything to the sufficiency inquiry unless there's extra evidence of guilty knowledge on top of that. And the things, the type of things this court has recognized in all of those cases is adding weight to allow that inference to have any life. Things like conflicting statements, implausible story, obvious or remarkable alterations to the vehicle, an explanation for something that's proven to be false later. None of that's present here in this case. The only other thing that the government gave the jury besides this, you know, valuable that one person heard there was a male voice on it that he didn't recognize. And Mr. Mata had phone calls on his cell phone to an unidentified number. And we want you to infer first that the person on that phone call was the driver. And we want you to infer second, that the calls were from that one of those calls that Mr. Mata made was to the loader of the truck. And it's one of these, it's the same call. And so that's where the inference on inference is coming in here. And so I just think it's very tenuous. And just briefly, I'll address this so that way we can get to it on rebuttal. Even if you don't, even if you find the evidence sufficient and even outside of the speculation, it was improper to give the deliberate ignorance instruction here. This is a flat out binary choice case. Either Mr. Mata knew or he didn't know and it's black letter fifth circuit law that if that's the choice before the jury, it's wrong to give the deliberate ignorance instruction. It's what you held in the Ariza Yacobo case that I argued in front of Judge Engelhardt a couple years ago. And it is just that that's absolutely what's at issue here. And so I'll stop there and I'll respond on harmlessness after Mr. Patrick. Mr. Patrick. Thank you. Yes, Chief Judge. Condolences, Judge King. I'm Ryan. I'm Ryan Patrick, the United States attorney for the Southern District of Texas for the United States and my first fifth circuit argument. I want to address a few comments made in the opening by defense first, and that is our case is not that Mr. Mata was present when the aliens were loaded. As a matter of fact, there's no testimony to that in the record. The testimony, however, does conflict with the two material witnesses in some part, but not in all part, not in every material way as was was alluded to. Specifically, they are in agreement that it took an hour and a half or longer to get from where they were loaded to the checkpoint, even though there was testimony listed that that was only about a 30 minute drive. And I'll get to that in a moment. But our case is not that there's no evidence of that in the record and and specifically addressing that one point on the conflict on the phone call, Judge Inglehart on page 255 28 of the record. The defense elicited from the first material witness, quote, He wasn't really paying attention. That's what the material witness said that he was nervous. He wasn't listening to all the sounds going on around him regarding all the voices and that they were in there about an hour and a half, an hour to an hour and a half. And I'll come back to the phone call, Judge Inglehart. Judge King, you ask, can we infer aliens or drugs and doesn't matter? I would argue no, that it does not matter. There's evidence in the record that the canine in this case specifically alerted to both humans and drug cargo. And I think there's a distinction between much of the Fifth Circuit case law on this issue, the third issue of deliberate ignorance that I'm going to get to first. And finally, Judge Owen, the conflicting testimony, the material witnesses on when the trailer was hooked up, there is a conflict there. It's in the record and it is what it is. However, on the sufficiency issue, the jury had all that information in front of them when they reached their verdict. But what I want to address first is issue number three, the deliberate ignorance charge that was given to the jury. This is an abusive discretion issue. And there's a two part test on whether or not the jury should be charged with this deliberate ignorance instruction. That is that the defendant was subjectively aware of a high probability of the existence of the illegal conduct and that the defendant purposely contrived to avoid learning of the illegal conduct. That's from Churchwell. And St. Junius says this is a very fact intensive endeavor. So I want to deal with issue number three because it is so fact specific. And I believe those same facts also go into the first two issues that hopefully will be a little more efficient argument we have here. On the issue of should he know, this was an appropriate charge to be given to the jury. And the reason is the government tried this case as Mr. Mata knew. He knew what he was doing. However, it was testimony elicited by the defense that clouded and muddied these waters. I'll give you an example. They hit the checkpoint. Mr. Mata the record. That's not an accident. And if you go and look at the timeline on how long it took for them actually to get to the checkpoint, the inconsistencies are across the board. Because if they were loaded in the trailer between four and five a.m. and I contend, we contend that it was closer to four a.m. because of some phone calls and the phone call logs. But if they're in that trailer around four a.m. in the early part of four a.m. and they don't hit the checkpoint till six forty five, they're in that trailer for two and a half plus hours, close to three hours. So Mr. Mata clearly was just driving around and driving around to hit the checkpoint at the time that he had to. This 30 minutes issue that's elicited by the defense from a Border Patrol agent with no foundation that you don't know where in Harlingen, what the traffic may be, but that it only takes 30 minutes to get there. On page 45 of the record, the defendant says there is furniture in the trailer. And on 499, he says it belongs to a friend and he's hauling furniture. But the defendant did not load it. But on page 500, the defendant admits that he hadn't been in the trailer. Quote, I don't know when asked if it was furniture. And on 492, the question answered with an agent. There's a colloquy back and forth where the defendant, quote, took a deep breath and sighed when he was asked to drive over to secondary. These are specific facts that go to the issue, two issues. It goes to it is a this case in its totality. The jury had all this conflicting testimony. They had this very confusing issue on the six pack photo spreads that is very confusing issue on the phone calls on what phone call happened when I'll address that in a second. But it was these issues for the deliberate ignorance charge because some of this muddied information came from cross-examination of the defense. They can't have it both ways. The defense cannot ask for in the charge conference at the end of the trial for their defensive theory to be put in, which is he didn't know and then object when the government comes when we ask for the deliberate ignorance charge. Now, on the deliberate ignorance issue, what it comes down to at the end, look, our contention is it is an appropriate charge to be given to the jury because of the specific facts. Did he not want to know? And that comes down to the latch on the trailer. If Mr. Mata did not want to know if he failed to investigate, if he purposely put his head in the answer with the agent who unlatched and unlocked and saw and viewed the trailer, there was no lock on the side door of the trailer. He said it was the agent said it was easy to open for Mr. Mata. Under these circumstances, was he subjectively aware of a high probability existence of the illegal conduct? He's given a trailer, told its furniture at four in the morning in a darkened street. It is already loaded. He never checks to see what's back there. He has to drive this the furniture is loaded appropriately. He doesn't want to know how it's chained to the truck appropriately. Does do the do the lights work? Does it have tags on it? Is he going to get pulled over? He does no investigation to further to find out what is going on with this trailer. And all of that evidence goes to he purposely put his head in the sand. Now, at the end, though, if the court does not believe that's appropriate charge, it's still harmless because in the closing arguments that we didn't even rely on the argument, we did not rely on that issue in making our argument to the jury that in the totality, this is a case that this is a direct knowledge case. Mr. Mata knew what he was doing, and that's the case the government tried. However, like I mentioned, it's these other issues brought in on cross examination. And one point I want to touch on specifically with deliberate ignorance, which is there is plenty of case law from the Fifth Circuit. You all are aware of it about this charge. And one of the issue, Lee, a case that recently came out where Judge Costa was very specific that he does not like these tried. The court as a whole does not like these charges given to the jury that he sees it now basically in every health care fraud case. And in that he uses an interesting comment that there was such substantial evidence opining why they would need to give this to the jury. And I contend that there is a big difference. And I'm not trying to be obtuse with this comment. There's a big difference between a multi week white collar health care fraud or pill mill case than a day, day and a half smuggling case, whether it be aliens or drugs. There's just a big difference. And what also distinguishes this case from many of the other cases on the deliberate ignorance charge where the court has taken issue with with our use of that charge in almost every one of those cases, there's either a statement, a confession, so to speak, by the defendant or the defendant takes the stand. There's such statements against interest that the court seems to be saying if there's such clear evidence that that's not the case, then why is that instruction given to the jury? But that's not what we have here. We're not trying to water down the burden of proof. We're not trying to change the men's ray. We're we're using everything, every error in our quiver to make our argument to the jury. And we're we're following the pattern jury charge. There's no issue that it's not the we're going to use what we have at our disposal on. So it's a failure to investigate. He didn't look into the trailer when he knew it was shady. And under the circumstances, the record supports the charge. And these are the I've gone through the facts that lead to it. On the issue of abuse of discretion on the phone calls, it's harmless because the the second material witness, Mr. Abadieh, was cross examined on this lack of knowledge. It starts at page 545 of the record. Quote, that's when he came close and he came close to hook up the trailer. And then, quote, the person who got us in the trailer asked, are you sure you want to take the risk? And a follow up quote. And he said, yes, recoding what he heard. Now, the material witness, Mr. Abadieh, is admits that he was making an assumption on page 549. He admits that he's the only other one besides the nine being held at the checkpoint. And at 551, he admits he does not know who was on the calls. All of this information was given to the jury. They were able to take all this information. And again, this also leads into the first issue on the sufficiency of the evidence. But on a de novo review, we give deference to the jury's verdict in this case. It's harmless abuse because it was cross examined. The district court has broad discretion in allowing testimony like this. The back and forth on the objection on the 602, that this was not only a present sense impression, but that this was also a statement by a conspirator, which is a party opponent. And that was the back and forth on the legal argument made in the trial court. In a can two case, personal knowledge can include inferences and opinion so long as they are grounded in personal observation and experience. This is Mr. Abadieh testifying to what his personal experience, what he heard and what he heard and didn't see that early morning when he was being loaded into the trailer. Also, let me let me drill down on that again. This witness is one of nine people present in the early morning hours, and he and the others meet with one one individual, right? Another man who is not Mr. Martin. Correct. Correct. They're putting the trailer. I'm assuming. Correct me if I'm wrong. They have not seen any other individual other than this person who I don't know whether he their money or whatever, but he loaded them onto the trail. Am I right so far? Yes, sir. OK. And then who else? Obviously, the theory, the government's case is that Mr. Mata shows up as the driver and is standing outside. And this witness hears a phone ring and it's he's assuming that it's Mr. Mata's phone, although he doesn't know Mr. Mata yet. He's assuming any any he deducts from the conversation that the person speaking on the phone is the one who's about to get in and drive. So, Mr. Abadieh, as he does not say it's Mr. Mata on the phone, he keeps referring to that person as the driver driving. Right. Right. So Mr. Mata's testimony is that he hears the man. He refers to him, I think, as a tall, big man make a phone call saying the trailer. And I don't remember the exact quote that the trailer is ready. And at the same time, he's saying he hears the other phone ring and the testimony that it's very dark. This is a quiet neighborhood. It's very dark. And so the inferences, the person making the phone call can't see around the truck, can't see around the corner or wherever. But he hears the other phone ring. The guy says, I'm ready. And then it's in quick succession that that person then gets into the truck and the truck starts driving. And then there's this conference. Are you willing to take the risk? Yes, I am. You agree with your opponent that the two people talking on the phone are actually present outside the trailer, whatever distance apart, they're both on the scene outside the trailer. Is that you're comfortable with that theory of fact? Yes, sir. That's that's what that's the way I read the record, the way I understand the trial and the testimony is that that is what Mr. Alvarez was testifying to. And there's corroborating evidence to this. So in the testimony that the HSI agent talks about the phone dump, there are short bursts of phone calls at four in the morning, the first being a 17 second phone call at four or eight in the morning. And so this other evidence came in to corroborate Mr. Alvarez his testimony, because in closing arguments, the defense admits the phone is Mr. Mattis. They give that up and close that there's there's no issue in the record on who the phone actually belongs to. Mr. Mattis never puts on a defense that I was wearing somebody else's pants. That was somebody else's phone in the truck. There's nothing like that. And the defense gives that up and close. So the phone dump shows all these little short hit phone calls in those first in those early morning hours, which corroborates what Mr. Alvarez is saying in the inference. And the argument is, well, who else is making phone calls at four in the morning to move furniture, quote unquote, furniture up to Corpus Christi? So, yes, that 602 issue or the issue with the phone call again, though, it's abuse of discretion to the trial court abuse its discretion. The trial court judge was able to see the demeanor, hear the testimony of Mr. Alvarez, see the cross examination, could have given instructions to the jury, chose not to. And there was no further there's no further objections from the defense after that. Is there any evidence where the stash house was? No, judge, there's not. There's evidence from the two material witnesses generally where they crossed. There were some railroad tracks. It's it's obvious from the testimony they did not know where they are. And there was nothing in the record other than a statement from Mr. Mata to the agent in the lane that he was coming from a dog coming from Harlingen, South Harlingen. Otherwise, no, there's nothing else in the record. But what we do have is corroborating testimony from both material witnesses. They were in that truck at least more than an hour, up to an hour and 45 minutes. But even if you take the early four o'clock time that they're loaded and he gets to the checkpoint at six forty five, we're at least two plus hours in the back of the truck. I assume they can chase the towers of the phones being off or not. Didn't that tell them something where the where the other side the four o'clock a.m. call took place? So none of that testimony came out in trial. The testimony was that the phone was taken and it was just a phone dump of the information on the phone. They the the agents did testify that they tried to go backwards on the on the truck itself and the registration, but they got lost in a series of what looks like, you know, some just arms sale, arms like transactions and maybe some cash sales of the car. So they they did attempt to try to McAllen and that's where the case ran cold on trying to track that. Well, if there aren't any other questions, I will give back some time and I respectfully ask that the verdict be upheld and I rest on the brief. Thank you, Mr. Patrick. Mr. House. Thank you, Judge Owen. Just a couple points here on rebuttal. Just some to specifically respond to a couple of things that Mr. Patrick was explaining. So Mr. Monta did not testify. Of course, the only testimony in the record is that he did state that he was coming from Harlingen whenever he was first asked, hey, where you know where where you come from, where are you going? He was very consistent with those throughout. So that's one point. But the other thing is that it was the agent who speculated that it would be, you know, a 30 minute drive or something like that. But Mr. Monta didn't say there's no basis to think from the testimony that my I departed and started my trip from Harlingen. He just said that's the route he was taking. He was coming from there. And so, I mean, it's really just not a strong piece of evidence to suggest that that's where this started. And as Mr. Patrick admitted, there's just no basis in the record to infer where this stash house was located. And, you know, again, the government can ask more questions. The ICE agents are the agents at the checkpoint. And then whenever they're interrogating later, they can ask more questions and say, did you know, are you saying you came, you started your journey in Harlingen? But that just didn't happen here. So I don't think that that's a very persuasive point. I do want to point out that Mr. Patrick just told this court that their case wasn't that Mr. Monta was present outside this trailer when the individuals were loaded into it. And if that's true, I'll take that because that means that there wasn't sufficient evidence to demonstrate that he knew about these individuals at all. So I think that has to be what their case was. It's certainly the only thing that you could possibly infer from the idea that there was a phone call that two people who were standing essentially next to each other decided to have right next to each other. And that's another thing I'd like to get to, Judge Inglehart, your question. To be clear, I agree with Mr. Patrick. I think that what Mr. Alva Diaz was saying is that these two people were standing outside within earshot and talking to each other on the phone. But I do want to point out, it's not at all clear that that's correct. It's certainly not free from doubt, given that no other non-citizen in this trailer out of nine people who had the exact same vantage point, only one of them heard a phone call. The government had access to these other seven individuals. It did not hold them over for trial. It did not keep them. I can't imagine that if one of those other individuals said they heard a phone call as well, that the government wouldn't keep them there to have corroborating testimony. So that's another problem with the government's case here, is that it just wasn't a strong one. And it certainly is implausible to think that these two individuals would have a phone call with each other if they're standing right next to each other. Monta's phone calls. So the phone calls, you know, I understand that the government wants to call these corroborating evidence, but they're really corroborative of nothing. I'll take what the district judge said at the November 7th pretrial conference. If you look at that hearing, there was kind of an argument over whether or not these calls should come in at all because nobody had any idea who they were made to. And, you know, trial counsel was saying, well, this could be prejudicial, Judge. And Judge Morales, and I agree with him on this point, says, well, you know, I don't think there's any basis to find that this is too prejudicial because for all we know, it could have been his grandmother. Right. And so I think we can reasonably exclude at 4 a.m. that Mr. Monta was calling his grandmother on the phone. But the judge's point is well taken. We just have no idea who was on that phone call. The only basis is the problem with the inference stacking here. The government wants you to assume that Mr. Monta is on that the loader called Mr. Monta. But it's that the only way to get there is for you to also draw the inference of the jury to also draw the inference that one of these phone calls was made from Monta to the loader. And there's nothing really to connect that up. And so that's certainly problematic. And. I guess the last thing I'll talk about is deliberate ignorance again. The government kind of admitted it when he talked about it in the closing argument. The government's case here wasn't one of everything that Mr. Patrick said about should have looked and failed to investigate one failure to investigate his negligence. That's not the basis for deliberate ignorance. And either way, it's also just not something that was before the jury. Their case was he knew he knew about this the entire time. And I can honestly represent to this court as an officer of it that I have read every single case that has the two words deliberate and ignorance inside of the same sentence that this court has issued. And of all of those cases where the evidence is actually described well, the case to actual knowledge is the weakest here. So even if you were to find that the evidence is sufficient, even though Mr. Monta or Mr. Alvarez couldn't recognize Mr. Monta's voice, despite hearing it three days later as the person on that phone call, you should. We do think that the court should reverse and remand for retrial. But the main problem here is the sufficiency of the evidence. Thank you. I have a quick question, Mr. House. Of course, it was since the 24 months in prison. Do you know what his projected release date is? I tried to find him in the Bureau of Prisons records yesterday, and I couldn't I couldn't Well, Chief Judge Owen, I didn't plan on pointing this out. But Mr. Monta is actually out on bond pending appeal. He got a few continuances on his surrender date because of the COVID-19 pandemic. And then the district judge said, I'm not going to give you any more. You're going to come in on November. And our trial counsel actually filed a motion for bond pending appeal and used Mr. Sakalo's briefs to argue that motion that there was a substantial basis that the appeal might be successful. And the judge granted that motion. And so he is on bond pending appeal right now. So if you were any of his sentence, he has not served any of his sentence. So if you were to rule in our favor, either way, he would stay out. He would either be bound over for retrial or he would be entitled in our view to judgment of acquittal based on insufficiency of the evidence. The reason I was asking if you were going to be released quickly, there would be, we need to expedite getting this case resolved. Sure. Well, I certainly don't want to suggest that you should drag your feet. But at the end of the day, he's out right now. So if the court was to take its time in issuing opinion either way, I don't think he would be too upset by it. We hope to be prompt, but I just wanted to make sure we didn't need to be really prompt. Absolutely. Thank you. Thank you. We have your arguments.